IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| REGINA BERRY, MIRIAM WNUK, and RACHEL ADAMS, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. _____ |
| v. | ) ) | |
| | ) | JUDGE |
| VANDERBILT UNIVERSITY, | ) ) | |
| *Defendants*. | ) ) ) ) | JURY DEMANDED |

## COMPLAINT

Plaintiffs Regina Berry ("Ms. Berry"), Miriam Wnuk ("Ms. Wnuk"), and Rachel Adams ("Ms. Adams") (collectively, "Plaintiffs"), allege the following claims against Vanderbilt University:

## INTRODUCTION

1. While employed by Vanderbilt University ("Vanderbilt" or "the University"), Plaintiffs observed sexual discrimination, sexual harassment, and a sexually hostile work environment.

2. Plaintiffs, individually and collectively, reported the sexual discrimination, sexual harassment, and sexually hostile work environment to various individuals with capacity to investigate and take prompt remedial action.

3. After making those reports of sexual discrimination, sexual harassment, and a sexually hostile work environment, the Plaintiffs actively participated in an internal investigation and gave statements to officials.

4.    After receipt of their complaints, and in retaliation for their refusal to remain silent, Vanderbilt conducted a sham "reorganization" of only their library units, resulting in the elimination of Plaintiffs' jobs.

## PARTIES, JURISDICTION, AND VENUE

5.    Regina Berry is an individual who resides in in Davidson County, Tennessee. Ms. Berry was employed by Vanderbilt from June 1998 until she was placed on administrative leave on June 9, 2025, and ultimately terminated on August 8, 2025. Prior to the alleged reduction-in-force, Ms. Berry served as Reserves and Media Coordinator in the Logistics and Access Services Department of the Jean and Alexander Heard Libraries (the "Library").

6.    Mirium Wnuk is an individual who resides in Snohomish County, Washington. Ms. Wnuk was employed by Vanderbilt from December 2020 until she was placed on administrative leave on June 9, 2025, and ultimately terminated on August 8, 2025. Prior to the alleged reduction-in-force, Ms. Wnuk served as Assistant Manager for Resource Sharing Services in the Logistics and Access Services Department of the Library at Vanderbilt.

7.    Rachel Adams is an individual who resides in Davidson County, Tennessee. Ms. Adams was employed by Vanderbilt from August 1991 until she was placed on administrative leave on June 9, 2025, and ultimately terminated on August 8, 2025. Prior to the alleged reduction-in-force, Ms. Adams served as Coordinator of Borrowing, Interlibrary Loan in the Logistics and Access Services Department of the Library at Vanderbilt.

8.    Defendant Vanderbilt University is a private university and non-profit corporation, with a principal address of One Vanderbilt Way, Suite 405, PMB 7802, Nashville, TN 37240. The registered agent for service of process is Vanderbilt University, 2100 West End Ave, Suite 1100, Nashville, TN 37203. During all material times, Vanderbilt received federal funding for its

2

academic programs and activities, as contemplated by Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq*.

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this District.

## STATEMENT OF FACTS

11.    Vanderbilt is a private academic institution that receives federal funding for academic programs and other activities.

12.    Vanderbilt purports to be committed to equal opportunity and to maintaining a safe and healthy environment for all members of the University community (including students, faculty, staff, postdocs, and trainees), guests, and visitors. The University's policies, programs, and activities are purportedly designed to foster courtesy and respect. The University purportedly prohibits and seeks to eliminate all forms of sexual misconduct, including sexual harassment and sexual assault. Under federal law, Vanderbilt has a duty to take steps to prevent and redress sexual misconduct. Such conduct is contrary to Vanderbilt's values and is not tolerated.[1]

13.    Vanderbilt maintains policies and procedures designed to prohibit and respond to complaints of sexual misconduct. It maintains a Sexual Misconduct Policy that outlines the procedures that apply to allegations of sexual misconduct, including sexual harassment and sexual assault, involving members of the Vanderbilt community. It is applicable to all members of the Vanderbilt community with respect to both conduct that occurs on campus and conduct that occurs off-campus that has an on-campus effect, including conduct in connection with University

---

[1] *See* www.vanderbilt.edu/title-ix/.

3

programs or activities or that otherwise interferes with or limits the ability of a member of the community to participate in or to receive benefits, services, or opportunities from the University's programs or activities.[2]

14.     Vanderbilt maintains a Non-Discrimination Policy designed to set forth its policy statement on discrimination and related procedures. Vanderbilt's policy states it does not discriminate against individuals on the basis of their race, color, national or ethnic origin, religion, sex, sexual orientation, gender identity, gender expression, pregnancy and related conditions, parental status, age, disability, military service, veteran status, genetic information, or any other classification protected by law in its programs and activities.[3] The policy states the University is committed to providing equal access and equal opportunity in employment, education, and all other areas of the University community.

15.     Vanderbilt maintains an Equal Opportunity and Access Office ("EOA"). Vanderbilt maintains policies, applicable to all faculty and staff, prohibiting discrimination, harassment and retaliation on the bases of protected class, including race, national or ethnic origin, religion, age, sexual orientation, gender identity, gender expression, military or veteran status, and genetic information, and related retaliation.

16.     Vanderbilt's policies prohibit discrimination, which it defines as, "treating someone differently or less favorably because of their race, color, national or ethnic origin, . . . or any other classification protected by law."  Additionally, it prohibits discriminatory harassment, which is defined as "any verbal, written, or physical conduct, or conduct using technology, directed

---

[2] *Id*.

[3] Vanderbilt University Non-Discrimination Policy, *available at* https://cdn.vanderbilt.edu/vu-sub/wp-content/uploads/sites/281/2025/10/09145458/Non-Discrimination-Policy.pdf.

toward someone because of their membership in a protected class that has the purpose or effect of substantially interfering with a person's work performance or participation in university activities, or creating an intimidating, hostile, or offensive environment."

17. Vanderbilt's policies define protected activity as: "(1) reporting (internally or externally) or inquiring, in good faith, about suspected violations of law or policy; (2) assisting others in reporting or inquiring, in good faith, about suspected violations of law or policy; or (3) participating in an investigation or proceeding related to suspected violations of law or policy."

18. Vanderbilt maintains a non-retaliation policy that prohibits actions that are "threatened or taken, directly or indirectly, intended to deter a person from engaging in protected activity or done in retribution for a person's engagement in a protected activity."

19. Vanderbilt maintains a Title IX policy that defines all faculty and most staff as Mandatory Reporters except certain "confidential resources" and "limited confidential resources" staff. The policy states: "Mandatory Reporters are required to immediately report all allegations of sexual misconduct (including sexual assault, sexual exploitation, dating violence, domestic violence, stalking, sexual harassment, or related retaliation) to the Title IX Coordinator. Mandatory Reporters cannot guarantee confidentiality but can promise privacy. The Title IX Office will contact and provide support, resources, and information to the person who may have experienced sexual misconduct."[4] Under the terms of this policy, each of the Plaintiffs was a Mandatory Reporter.

20. Scott Martin ("Mr. Martin") was a long-term employee of Vanderbilt and received several promotions throughout his employment. In 2023, he served as the Director of Logistics and Access Services Department.

---

[4] *See* https://www.vanderbilt.edu/title-ix/mandatory_reporter/.

21. Plaintiffs all worked in different roles within Core Services (renamed Logistics and Access Services Department), and all reported up to Mr. Martin as of February 2023.

22. On or about June of 2023, Ms. Berry learned that a male co-worker with less experience in the library had been given a higher percentage raise than Ms. Berry.

23. Ms. Berry had recently moved, in December 2022, to the library's circulation department, which was overseen by Mr. Martin and managed by Daisy Whitten ("Ms. Whitten"). Ms. Berry received a letter indicating that she would be receiving a raise that was below the library average in 2023. This was the first time in her employment she ever received a raise that was not equal to or above the average raise for employees in the library.

24. On or about Summer of 2023, Ms. Berry sent an email to Ms. Whitten, who was her direct supervisor, and Mr. Martin with an express complaint regarding sexism and pay inequity. Specifically, she complained the only staff member on the team who did not receive a below average raise was a white male under forty years old with similar job duties to her.

25. Vanderbilt, upon receipt of her complaint, increased her raise, but it was not equal to the raise received by the younger, male co-worker. Mr. Martin suggested Ms. Berry take any complaints of sex discrimination to the Human Resources Department.

26. Many employees of the Vanderbilt library confided in Ms. Berry that Mr. Martin had created a sexually hostile work environment through his comments and behaviors. For example, Plaintiff Wnuk disclosed to Plaintiff Berry that Mr. Martin had asked her whether she shaved her legs.

27. On or about August 2023, Ms. Berry sent an email to Chris Hicks, in Human Resources, complaining of sexism by Mr. Martin and pay inequity. In her email, she detailed her complaints of sex discrimination and hostile work environment perpetrated by Mr. Martin. This

6

included, but was not limited to, complaints about Mr. Martin making unwanted comments about female employees' bodies, appearance, and/or dress; refusing to hire qualified females; and excluding female employees from meetings they should have attended. Mr. Hicks referred Ms. Berry to Vanderbilt's Equal Opportunity and Access Office ("EOA Office").

28. Ms. Berry then contacted the EOA Office and initiated a complaint of sex discrimination and hostile work environment. She subsequently fully participated in an interview with an investigator, Kathryn Layman, in the EOA office.

29. On or about Summer of 2023, Plaintiff Wnuk observed Mr. Martin engaging in sexually hostile behavior that she discerned violated Vanderbilt's internal policies and federal and state law. Specifically, Ms. Wnuk observed Mr. Martin say sexually charged statements to her colleague Robyn Weisman ("Ms. Weisman"). Additionally, Ms. Weisman disclosed to Ms. Berry that Mr. Martin engaged in sexually inappropriate behavior. For example, Ms. Weisman told Ms. Berry he showed Ms. Weisman a still image from a security camera video; in the image, one could see down her shirt.

30. Several other women in the library confided in Ms. Berry about sexual harassment by Mr. Martin.

31. Ms. Berry sent an email to the EOA investigator, Ms. Layman, with the information about this sexually harassing behavior by Mr. Martin; however, she did not receive any response.

32. In April 2024, Ms. Berry spoke with Sydney Selimagic ("Ms. Selimagic"), the Library Human Resources Administrator, about the status of her EOA complaint. Ms. Selimagic told Ms. Berry the EOA considered the case closed. She then told Ms. Berry that, in the future, she should only report cases that immediately involved herself.

7

33. Ms. Selimagic's statement is contradicted by Vanderbilt's policies, which direct all employees who are mandatory reporters (including Ms. Berry) to report **all** discriminatory, harassing, and retaliatory behavior.

34. Concerned by the ongoing sexual harassment by a supervisor, her concerns about pay equity, and the lack of response from the EOA Office, Ms. Berry learned that Vanderbilt had a Title IX office and reached out to that office to set up a training session for the library.

35. In September 2024, a training session was held by the Title IX office for the library Core Services Unit, which included Central Circulation, Resource Sharing, Annex, Facilities, Mailroom, and Event Coordinator.

36. Immediately after the training, Ms. Berry asked Michael Fazi, in the Vanderbilt Title IX Office, if the EOA complaint she made previously was on their radar and whether the Title IX Office had investigated the complaint. Mr. Fazi responded that he was unaware of her complaint.

37. After the training, and Ms. Berry's inquiry, the Title IX Office began to interview library staff, former staff, and student employees regarding Ms. Berry's August 2023 complaint to the EOA office. Several current and former employees were interviewed, including Plaintiff Berry, Plaintiff Wnuk, and Plaintiff Adams. The three Plaintiffs were interviewed more than once, and for up to several hours collectively. During their interviews, they reported violations of Vanderbilt's sexual harassment and equal opportunity policies.

38. In September 2024, Ms. Wiesman submitted her resignation, and day-to-day management of Resource Sharing Services was assigned to Plaintiff Wnuk, although Vanderbilt did not change her title or her compensation rate.

39. The Title IX investigation substantiated the complaints of Ms. Berry and the other plaintiffs. On or about March 7, 2025, Vanderbilt terminated Mr. Martin.

40. After Mr. Martin's termination, Vanderbilt made several personnel changes in the Library and each change progressively worsened the Plaintiffs' respective job duties and reporting structure.

41. Vanderbilt assigned the Resource Sharing Services, Central Circulation, and Annex to Angela Machelle Keen ("Ms. Keen") as Interim Director. Ms. Keen previously served as User Services Coordinator at the Science and Engineering Library. On information and belief, Ms. Keen has a high school diploma and had no experience regarding resource sharing or supervision of staff. Ms. Keen had less experience and/or education than Ms. Wnuk, Ms. Berry, Ms. Adams, and/or Ms. Whitten.

42. The remainer of Mr. Martin's unit, now called Facilities and Mailroom Services, was assigned to James Tristan Keen ("Mr. Keen"), Ms. Keen's son. His previous title was Coordinator of Central Library and Mailroom Services, and he had no direct supervision experience. On information and belief, Mr. Keen's highest level of education is a high school diploma. Mr. Keen was selected to lead this department despite the position's proximity to his mother.

43. After the announcement of Ms. Keen's position, Ms. Whitten, the senior supervisor and 10-year coordinator of Public Services at Central Circulation, submitted her resignation to retire on March 10, 2025. Work completed by Ms. Whitten was then redistributed to Ms. Keen, Yolanda Campbell, and Ms. Berry during the notice period. Plaintiff Berry was not asked to apply for or formally assume any of Ms. Whitten's duties.

9

44. On March 13, 2025, Kathy Turbeville, a female employee, who served as a dual employee of RSS and mailroom, was removed from RSS duties and assigned solely to the mailroom.

45. Plaintiff Wnuk initially absorbed the duties of Ms. Turbeville, without any additional compensation or title change. Ms. Wnuk then began training Plaintiff Adams on some of the duties.

46. On or about March 14, 2025, Plaintiffs Adams and Wnuk were instructed to have all their correspondence with faculty approved by Ms. Keen or her supervisor, Honora Eskridge, neither of whom had experience performing the day-to-day tasks and duties that Plaintiffs Adams and Wnuk performed.

47. On or around this time, Plaintiff Wnuk emailed the Title IX office with concerns that she and others, including Ms. Berry and Ms. Adams, had been retaliated against for their role in the investigation and termination of Mr. Martin. She received no substantive response.

48. On April 9, 2025, Plaintiffs Berry, Wnuk, and Adams met with Librarian Jon Shaw ("Mr. Shaw") during his open office hours and discussed concerns they had regarding the Library.

49. At the end of the meeting, Mr. Shaw said he would hold office hours again in May, and they could follow up with him then.

50. When Ms. Berry did not see Mr. Shaw's May office hours published in the Library news blog, she contacted Shore Griffin ("Ms. Griffin"), Mr. Shaw's assistant, and asked if Mr. Shaw planned to have May office hours. Ms. Griffin said no, but offered to set up a meeting with Mr. Shaw. Ms. Griffin then told Ms. Berry that Mr. Shaw was not available for a meeting and that Plaintiffs should go to HR with their concerns.

51. The Plaintiffs participated in a staff meeting led by Interim Director Ms. Keen on May 22, 2025. At the meeting, Ms. Keen was visibly hostile and combative towards Plaintiffs, all of whom had participated in the Title IX investigation.

52. On June 2, 2025, Plaintiffs Adams and Wnuk were given a warning for their respective tones during the May 22, 2025 meeting. This warning barred them from receiving forthcoming annual merit increases and barred Wnuk's ability to seek promotion for a year.

53. On May 29, 2025, Plaintiffs Berry and Wnuk met with the Title IX office to discuss their complaints of retaliation. Specifically, they complained that after their complaint of sexual harassment and gender discrimination to the Title IX office, they suffered employment actions that adversely affected their terms and conditions of employment, including the unfair restructuring of the departments, that they were not allowed to apply or interview for interim or permanent positions that they were well-qualified for, and that upper management refused to listen to or address their complaints.

54. On or about June 1, 2025, Plaintiffs Berry, Wnuk and Adams met with the Title IX office for individual intake interviews regarding their complaints of retaliation.

55. On June 9, 2025, Plaintiffs Berry, Wnuk, and Adams were all terminated in an alleged reduction in force. The three Plaintiffs were immediately put on a 60-day administrative leave. They were escorted out of their work unit immediately and in front of other library staff.

56. Simultaneously with the alleged reduction in force, the Library created three new positions. The Plaintiffs were informed that they were eligible to interview for those positions.

57. Ms. Berry applied for the newly created positions but was not selected.

58. Ms. Adams applied for an open position in Acquisitions within the library system but was not invited to interview.

59. Vanderbilt promised all three Plaintiffs that they would have "priority eligibility" to any open positions at Vanderbilt.

60. However, when they were escorted out of the building, Vanderbilt intentionally disabled their VUNet ID accounts and they could not submit applications to any job applications. They also did not receive any "priority status" for job applications as promised. Plaintiffs could not submit applications to any priority job applications internally. They also did not receive any "priority status" for job applications as promised and were given no clarification about the meaning of that status.

61. After they each complained to Vanderbilt Human Resources,Vanderbilt very slowly restored access to the VUNet. Vanderbilt restored access on June 26 for Ms. Adams, June 30 for Ms. Berry and August 6 for Ms. Wnuk.

62. Plaintiffs Berry and Adams applied for numerous positions within Vanderbilt and were not selected for any. Vanderbilt did not have any openings that fit the experience and credentials of Plaintiff Wnuk, a certified librarian.

63. No Plaintiff ever received the "priority eligibility" they were promised.

64. On information and belief, while former employees are promised "priority eligibility" for applications to open positions at Vanderbilt, no such priority eligibility actually exists in Vanderbilt's online application system. Officials at Vanderbilt knew that such priority eligibility did not exist and/or was not operational, yet they promised such status to Plaintiffs regardless.

**COUNT ONE: RETALIATION IN VIOLATION OF**
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,** *et seq.*

65. Plaintiffs incorporate Paragraphs 1 through 64 above as if each has been fully stated herein.

66.     Title IX of the Education Amendments of 1972 provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681a.

67.     Vanderbilt University receives federal financial assistance in the form of federal grants for educational program.

68.     Plaintiffs Berry, Adams and Wnuk engaged in protected activity when they spoke out about and complained about sex discrimination, sex-based wage disparity, and sexual harassment.

69.     Vanderbilt knew about Plaintiffs' protected activity.

70.     Plaintiffs suffered an adverse employment action when: (a) during the interim reorganization they were not considered for nor received any interim positions despite being well-qualified; and (b) they were terminated after their reports of discrimination, harassment and retaliation.

71.     There is a causal connection between the protected activity and the adverse action.

72.     As a result of these acts and omissions, Vanderbilt retaliated against Plaintiffs for their protected activity in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

73.     As a result of Vanderbilt's violations of Title IX, Plaintiffs are entitled to damages in an amount to be determined at trial, equitable relief, and reasonable costs and attorney's fees.

## COUNT TWO: RETALIATION IN VIOLATION OF
## THE TENNESSEE HUMAN RIGHTS ACT, TENN. CODE ANN. §§ 4-21-101, *et seq.*

74.     Plaintiffs incorporate Paragraphs 1 through 73 above as if each has been fully stated herein.

75. Plaintiffs engaged in protected activity when they reported and/or participated in the investigation of the sexual harassment and discrimination described above.

76. Defendant knew that Plaintiffs engaged in protected activity.

77. Defendant terminated Plaintiffs as part of a sham "reorganization" because they engaged in protected activity.

78. As a result of these acts and omissions, Defendant violated the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101, *et seq.*

79. As a result of Defendant's violation of the Tennessee Human Rights Act, Plaintiffs are entitled to compensatory damages in an amount to be proven at trial, punitive damages, back pay, interest on back pay, front pay, and other equitable relief, and reasonable costs and attorney's fees.

**COUNT THREE: PROMISSORY ESTOPPEL (DETRIMENTAL RELIANCE)**

80. Plaintiffs incorporate Paragraphs 1 through 79 above as if each has been fully stated herein.

81. Defendant made promises and representations upon which they reasonably expected Plaintiffs to rely.

82. Defendant promised Plaintiffs that they would have "priority eligibility" or applications to open positions at Vanderbilt, knowing that no such priority eligibility actually exists in Vanderbilt's online application system. Officials at Vanderbilt knew that such priority eligibility did not exist and/or was not operational, yet they promised such status to Plaintiffs regardless.

83. Plaintiffs, in fact, reasonably relied on Defendant's promise that they would have priority eligibility to jobs at Vanderbilt.

84.     Plaintiffs reliance resulted in substantial and definite detriment, including but not limited to lost time in their respective job searches, inability to apply timely for open positions and Vanderbilt, and a substantial impact on their ability to mitigate the damages caused by Vanderbilt's retaliatory employment actions.

## RELIEF REQUESTED

1. A jury to try their claims.

2. Entry of judgment in favor of Plaintiffs, and against Defendant, for economic damages in an amount to be proven at trial.

3. Entry of judgment in favor of Plaintiffs, and against Defendant, for compensatory damages in an amount to be proven at trial.

4. Entry of judgment in favor of Plaintiffs, and against Defendant, for any other appropriate equitable relief.

5. Entry of judgment in favor of Plaintiffs, and against Defendant, for damages flowing from Vanderbilt's failure to abide by its promises to Plaintiffs.

6. Entry of judgment in favor of Plaintiffs, and against Defendant, for punitive damages.

7. An award of Plaintiffs' costs, reasonable attorney's fees, and pre- and post-judgment interest.

8. Any other legal or equitable relief to which Plaintiffs may be entitled.

Dated: April 10, 2026                    Respectfully submitted,

                                         **HUNTER LAW FIRM, PLC**

                                         /s/ *Anne Bennett Hunter*
                                         Anne Bennett Hunter, BPR No. 022407
                                         5115 Maryland Way, Suite 125
                                         Brentwood, TN 37027
                                         (615) 595-2977
                                         anne@hunteremploymentlaw.com

15

**JESSE HARBISON LAW, PLLC**

/s/ *Jesse Ford Harbison*

Jesse Ford Harbison, BPR No. 032105
613 Woodland Street
Nashville, TN 37206
(629) 201-7284
jesse@jesseharbisonlaw.com


*Counsel for Plaintiffs*